Earnest Thompson and Louise Thompson appeal from a directed verdict in favor of United Companies Lending Corporation and United Companies Financial Corporation (collectively, "United"). We affirm in part, reverse in part, and remand with instructions.
The Thompsons' original three-count complaint sought relief from United Companies Financial Corporation, United Companies Mortgage of Alabama,[1] and fictitiously named defendants, seeking compensatory and punitive damages under two theories: (1) negligent failure to repair electrical wiring in the Thompsons' home, and (2) fraudulent misrepresentation that the Thompsons' home was "fully insured." The complaint was later amended so as to name United Companies Lending Corporation, as successor in interest to United Companies Mortgage of Alabama, as a defendant. This amended complaint added a fourth count, which alleged that United had fraudulently charged and collected points from the Thompsons in excess of those allowed by §5-19-4(g), Ala. Code 1975, a portion of the so-called "Mini-Code." United moved to "abate" the action based upon a pending Mini-Code class action in Mobile County against United that included the Thompsons' Mini-Code claim. The Thompsons opposed these motions and amended their complaint a second time to add a claim alleging negligent or wanton failure to procure insurance.
The trial court, in response to United's motion to abate, entered the following order:
 "It is . . . agreed between the Parties that as to the Motion to Abate, . . . Count 4 of the Complaint is severed pending further orders of this Court."
The trial court later denied United's motion for summary judgment, and the case proceeded to trial. At trial, the parties presented evidence as to all theories appearing in *Page 171 
the complaint, except the Mini-Code theory; after the Thompsons had concluded their case-in-chief, United moved for a judgment as a matter of law under Rule 50, Ala.R.Civ.P.[2] The trial court directed a verdict in favor of United "as to all claims" and entered a judgment thereupon.
The Thompsons appealed to our supreme court. That court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.
Before we consider the propriety of the directed verdict, we note that the parties have agreed that the trial court's direction of a verdict in favor of United "as to all claims" did not embrace Count 4 of the complaint as amended, in light of the trial court's order severing this count. "When . . . a claim is severed from the original action, as authorized by Rule 21, [Ala.R.Civ.P.], a new action is created, just as if it had never been a part of the original action, and a completely independent judgment results." Key v. Robert M. Duke Ins.Agency, Inc., 340 So.2d 781, 783 (Ala. 1976). Furthermore, "since the question severed could have originally been presented in an independent action, the substance of the court's action is consistent with its form." Id. at 783-84. Therefore, Count 4 is no longer part of this civil action, but remains pending in the trial court, and we do not reach the merits of the Thompsons' Mini-Code claim.
We also note that in their brief the Thompsons do not raise any issue concerning the correctness of the trial court's judgment as to their claims against United concerning negligent repair. Therefore, on the authority of Leisure Am. Resorts,Inc. v. Knutilla, 547 So.2d 424, 425 n. 2 (Ala. 1989), we affirm the trial court's judgment as to this issue, and confine our analysis to the propriety of the directed verdict as to the Thompsons' claims of fraudulent misrepresentation, their claims of wrongful failure to procure insurance, and their entitlement to punitive damages.
Our standard of review of a judgment based upon a directed verdict is settled:
 "The standard of review applicable to a directed verdict motion is whether the nonmovant has presented sufficient evidence to allow submission of the case or issue to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350
(Ala. 1992). The nonmovant must present substantial evidence supporting each element of his cause of action. Substantial evidence is 'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' "
Key v. Maytag Corp., 671 So.2d 96, 101 (Ala.Civ.App. 1995) (quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989)). Moreover, "in reviewing the ruling on a motion for a directed verdict, this Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw." Driver v. National Sec.Fire Cas. Co., 658 So.2d 390, 392 (Ala. 1995).
The record reveals that United first extended credit to the Thompsons in 1985, when they borrowed $9,000 for home improvements. United's loan was secured by a mortgage on the Thompsons' home in Florence, Alabama, which had been their residence since 1958. When the Thompsons applied for the loan, their home was apparently insured by an entity identified at trial only as "Mutual Company," although the details of this insurance coverage were not introduced into evidence.
Ms. Thompson testified that Jerry Rains, United's branch manager, told the Thompsons when they applied for the home improvement loan to "leave it all up to me," that United would furnish a contractor, and that he would send someone to the Thompsons' home. Rains also said that the Thompsons would not "have to buy anything," and that "United would furnish it." Rains later went to the Thompsons' home to obtain estimates, *Page 172 
and Ms. Thompson testified that on this visit he went into the kitchen to talk to her. Thompson testified that Rains said "you are fully covered; you don't have to worry about no insurance. United will take care of it." Rains, for his part, testified that he did not think he had ever told anybody that they were fully insured.
The mortgage that the Thompsons gave in 1985 as security for the repayment of their loan required them to maintain insurance on their home. The mortgage also states that United has the option, but not the obligation, to insure the real estate "for its full insurable value (or such lesser amount as [United] may wish) against . . . risks of loss," and that any amounts spent by United to obtain such insurance shall become a debt due from the Thompsons. Mary Clark, an employee of United's Insurance and Tax Division, testified that United considers the actual cost to repair or replace a mortgaged house to be the "insurable value" of that house, and that the "insurable value" should be used as the amount of coverage required under the mortgage.
In 1986, agents of Russellville Realty and Insurance Company, Inc., completed a National Security Fire and Casualty Company "Low Value Dwelling" application for insurance for a policy insuring the Thompsons' home. This application is written to seek $10,000 in "dwelling" coverage on the Thompsons' home, but no coverage amount is filled in for the "contents" of the home. Surprisingly, however, neither United nor the Thompsons testified at trial that they initiated this application. Although the application bears the signature of "Earnest Thompson" on its face, Mr. Thompson testified at trial that he is unable to read or write and that he signs his name with a mark. Also, Ms. Thompson testified that she did not obtain coverage from National Security and knew nothing about it. Both Rains and Sally Gusmas, another United employee at the time, denied that United had selected National Security insurance for the Thompsons. Regardless of who initiated this application, however, it is undisputed that National Security accepted this application, and that United paid the yearly premiums on this policy from the Thompsons' escrow account while it was in effect.
The Thompsons made monthly payments to United for the next nine years, and twice refinanced their loan, in 1987 and in 1991. On both occasions, the Thompsons executed mortgages bearing provisions similar to the original mortgage terms requiring the Thompsons to insure the property against hazards and giving United the option to "force-place" hazard insurance coverage on the property to protect its interests in the event that the Thompsons did not provide insurance.
Ms. Thompson testified that she typically made payments to United on their loans by going into United's office on the third of each month, and that she routinely asked Mr. Rains about their insurance coverage. She further testified that "every time" she went into the United office to make a payment, Mr. Rains would say that they "were fully covered," not to "worry about a thing," and that Ms. Thompson "had nothing to worry about." However, the record does not reveal that the Thompsons' insurance policy with National Security was ever renewed after July 8, 1990.
The principal amount of the Thompsons' loan as refinanced on September 23, 1991, was $8,300. On that date, Rains prepared an appraisal on the Thompsons' home and property, assigning it a market value of $18,000; this appraisal form also reveals that at the time of the second refinancing, the Thompsons' property was insured for $10,000 with Balboa Insurance Company ("Balboa"), a Pennsylvania corporation that United used for all of its mortgagors' force-placed hazard insurance coverage. Gusmas completed a form within several days of the refinancing which requested that Balboa issue $10,000 of force-placed insurance coverage on the Thompsons' home. Additionally, although the department at United where Gusmas was employed asked Balboa to increase this amount from $10,000 to $16,500 in 1992, Balboa apparently failed to update its computer system to reflect any increase in coverage.
In connection with its force-placement of the Balboa insurance coverage, United sent the Thompsons a notice, dated October 31, 1991, *Page 173 
that it had obtained $10,000 in coverage on their property from Balboa, and that the charges for the policy had been billed to their account. The notice also stated as follows:
 "This coverage differs from the usual Homeowner's policy. It covers physical damage to the structure only. It provides no coverage for loss or damage to personal property, loss from theft, or injury to persons or property for which you may be liable. . . . The coverage limits may be less than your previous policy, and may not be sufficient to restore the property in the event of a total loss."
Ms. Thompson affirmed that she had indeed received this notice, which was sent to the same post office box where the Thompsons received their Social Security checks and other governmental mailings.
The Thompsons' home suffered a fire on November 28, 1993, which caused the loss of substantially all of their possessions. After United was notified of the loss, a Balboa Insurance Company adjuster investigated the fire and estimated the cost to repair the Thompsons' house to be $23,427, and its replacement cost to be $40,312. In 1994, Balboa sent a check for $10,000 to the Thompsons for their endorsement and forwarding to United; United applied $7,075 of the proceeds to pay off the Thompsons' loan and returned the remaining $2,925 to them. Two years later, as the case neared its first trial setting in 1996, Balboa sent a check for $6,500 to the Thompsons as further payment of their claim.[3]
 I. Fraudulent misrepresentation
The Thompsons contend that their claims for fraudulent misrepresentation should have been submitted to the jury for resolution. Alabama law is settled that before a misrepresentation claim may be submitted to the jury, a plaintiff must present substantial evidence of four elements of fraud: "(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result." Baker v. Bennett,603 So.2d 928, 935 (Ala. 1992), cert. denied, 507 U.S. 912,113 S.Ct. 1260, 122 L.Ed.2d 658 (1993). "A false representation, even if made by mistake or innocently, is a legal fraud . . . entitling a plaintiff to compensatory damages." Id. The Thompsons contend that they adduced substantial evidence of each of these necessary elements.
United contends that the Thompsons' evidence is insufficient to prove a misrepresentation claim because, it says, the alleged statements of Rains were not actually misrepresentations. Under our standard of review, however, Ms. Thompson's testimony establishes this element. According to Ms. Thompson, Rains said in 1985, before the loan was ever closed, that the Thompsons were fully covered, and that they did not have to worry about insurance. Moreover, Ms. Thompson testified that Rains repeated these assurances every time she made apayment on the loan. These representations of "full coverage" may simply have been intended as comments or opinions on the breadth or limits of the Thompsons' coverage as it proceeded through Mutual to National Security to Balboa. However, Rains's alleged use of the term "full coverage" in the context of property hazard insurance might also be interpreted by laypersons such as the Thompsons as equivalent to coverage sufficient to rebuild one's home, that is, full replacement or restoration upon occurrence of a covered loss.
The Thompsons were never shown a copy of the Balboa policy; thus, United and its agents at all times possessed superior knowledge of just what coverage the Thompsons had. Where the facts are not equally known to both parties, a statement of opinion by one who knows the facts better, often involves a statement of material fact that justifies the opinion, such that an action for fraud may be predicated upon the statement.See Reynolds v. Mitchell, 529 So.2d 227, 231 (Ala. 1988). Moreover, whether a statement is an expression of an opinion or a statement of fact depends upon all the circumstances of the particular case, and the question should be left to the jury.See Joe Cooper Associates, Inc. v. Central Life AssuranceCo., *Page 174 614 So.2d 982, 990 (Ala. 1992); Boswell v. Coker, 519 So.2d 493, 496
(Ala. 1987).
Similarly, we conclude that the statements of Rains were material to the Thompsons and were relied upon by them. When questioned at trial, Ms. Thompson testified that she had relied on United to select the insurance and the correct amount of insurance for her home and to maintain it until the loan was fully paid. Not only does this testimony constitute substantial evidence of the Thompsons' reliance, it also constitutes substantial evidence of the materiality of Rains's statements concerning full coverage. Under Alabama law, "a 'material fact' is a fact of such a nature as to induce action on the part of the complaining party," Executive Dev., Inc. v. Smith,557 So.2d 1231, 1233 (Ala. 1990), such as the Thompsons' failure in this case to purchase full replacement coverage on their home.
Because this case was pending on March 14, 1997, whether the Thompsons' reliance is of a variety that allows their recovery of damages is tested under the "justifiable reliance" standard.See Foremost Ins. Co. v. Parham, 693 So.2d 409, 421 (Ala. 1997) (prospectively overruling Hickox v. Stover, 551 So.2d 259
(Ala. 1989)). Under Hickox,
 "[r]eliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is 'one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth.' "
551 So.2d at 263 (quoting Southern States Ford, Inc. v.Proctor, 541 So.2d 1081, 1091-92 (Ala. 1989) (concurring opinion)). As the special concurring opinion in Southern StatesFord made clear, "[t]he consideration of whether a given plaintiff's reliance is 'justifiable' is not the same as the determination of whether it is 'reasonable.' The former is more subjective . . . [and] the latter [is] more objective." 541 So.2d at 1089. " 'Justifiability' places less emphasis on the 'neglect' of the plaintiff," in favor of placing more emphasis on the tortfeasor's actions. Id.
The evidence presented at trial does not indicate that the Thompsons were such sophisticated purchasers of insurance that their reliance upon Rains's unequivocal representation of full coverage would have been unjustifiable as a matter of law. Earnest Thompson testified that he is 81 years old and that he cannot read or write; other evidence indicated that Mr. Thompson has had no schooling at all and that he is retired from custodial work. Louise Thompson is a 69-year-old domestic laborer, and although she is literate, she never finished high school. Moreover, there was no evidence before the trial court showing that the Thompsons had special knowledge of insurance matters, or that they had ever sought or obtained insurance on their own behalf, except for their policy with "Mutual Company," the contents of which were not made known to the trial court. We note that while United argues that it did not obtain the National Security policy for the Thompsons in 1986, Ms. Thompson's testimony that she did not obtain coverage from National Security and knew nothing about it constitutes substantial evidence that the Thompsons did not themselves apply for the National Security coverage.
Additionally, while the Thompsons undisputedly did receive at least one notice in 1991 that the force-placed Balboa coverage provided no protection against loss or damage to personal property, and that it might not be sufficient to restore the property in the event of a total loss, there was evidence that Rains was continuing to represent to the Thompsons that they were fully covered, and that they should not worry, just as he had since 1985 "every time" the Thompsons made their monthly payments. Viewing the evidence in the light most favorable to the Thompsons as nonmovants, we cannot conclude that, as a matter of law, they "closed [their] eyes to avoid the discovery of the truth" of the nature of their hazard insurance coverage. The justifiability of their reliance upon Rains's representations was a question of fact to be resolved by the jury. AT T Info. Sys., Inc. v. Cobb Pontiac-Cadillac, *Page 175 Inc., 553 So.2d 529, 532 (Ala. 1989) (justifiability of reliance held a fact question).
There was also evidence of damage resulting from the fraudulent representations of Rains to which Ms. Thompson testified. The Thompsons' home was burned, and the insurance coverage that United had purchased fell far short of the Thompsons' expectations of full coverage. They were unable to rebuild their home with the $2,950 left over from Balboa's first payment in 1994; indeed, Balboa's adjuster concluded that it would require over $23,000 to repair the Thompsons' home, an amount well above even the $16,500 gross amount of insurance that United's employees testified that United had procured on the house. Thus, we conclude that the Thompsons have demonstrated substantial evidence of each element of their claims of fraudulent misrepresentation sufficient for submission of that claim to the jury. Therefore, the trial court erred in directing a verdict for United on the Thompsons' claims of fraudulent misrepresentation.
 II. Wrongful failure to procure insurance
We now turn to the question whether the trial court properly directed a verdict on the Thompsons' claims of wrongful failure to procure insurance. Both a negligent failure and a wanton failure to procure insurance are actionable under Alabama law.See Henson v. Celtic Life Ins. Co., 621 So.2d 1268, 1274
(Ala. 1993). To prove negligence, the Thompsons "must establish all four elements of the action: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." Crowne Invs. v. Bryant,638 So.2d 873, 878 (Ala. 1994).
The same evidence that we have held warrants reversal with respect to the Thompsons' fraudulent misrepresentation claim constitutes substantial evidence of each element of the negligent-failure-to-insure claim to warrant its submission to the jury. Rains's statements that the Thompsons were "fully covered" and that "United will take care of it," if believed by the jury, would support a finding that United, acting through its agent, undertook a duty to provide full coverage on the Thompsons' home, separate and apart from United's disclaimer of a duty to insure in its mortgage forms. The same may be said as to United's possible procurement of National Security insurance for the Thompsons in 1986; while United representatives testified that they did not force-place coverage with National Security, Ms. Thompson denied that she applied for this coverage, and she testified that her husband's signature on the application was not and could not have been genuine. "[A]lthough a person may not owe a duty to another, a duty can arise when that person volunteers to act on behalf of another."Palomar Ins. Corp. v. Guthrie, 583 So.2d 1304, 1306 (Ala. 1991) (involving jury finding of insurance broker's assumption of duty to notify insured of renewal and lapse dates of policy);see also Rudolph v. First So. Fed. Sav. Loan Ass'n,414 So.2d 64, 67 (Ala. 1982) (applying rule to mortgage lender). Further, United's failure to provide full coverage on the Thompsons' home caused them a substantial monetary loss. Under these circumstances, we conclude that the trial court erroneously directed a verdict as to the negligent-failure-to-procure-insurance claim, and we reverse and remand on this issue as well.
However, we reach a different result with respect to the Thompsons' wantonness claim. "To be guilty of wanton conduct, one must, with reckless indifference to the consequences,consciously and intentionally do some wrongful act or omit some known duty." Carter v. Treadway Trucking, Inc., 611 So.2d 1034,1035 (Ala. 1992) (emphasis added). The Thompsons failed to adduce any evidence of Rains's state of mind tending to indicate that he consciously or intentionally misrepresented the Thompsons' present or future hazard insurance coverage. Furthermore, we disagree with the Thompsons' contention that United's mere failure to use an outside appraiser in determining how much coverage to force-place on the property amounts to substantial evidence that United consciously orintentionally placed less than full coverage. We conclude that the trial court properly directed a verdict as to the wanton-failure-to-procure-insurance claim, and we affirm its judgment on this issue. *Page 176 
 III. Punitive damages
Finally, we consider the Thompsons' argument that they presented sufficient evidence to submit their claims for punitive damages to the jury. The evidentiary standard that a party must meet to warrant submission of an issue of punitive damages to the jury differs from the general "substantial evidence" rule ordinarily applicable to submission of issues of fact. Compare § 6-11-20, Ala. Code 1975, with § 12-21-12(a); seealso Ex parte Norwood Hodges Motor Co., 680 So.2d 245, 248-49
(Ala. 1996). Under § 6-11-20, "[p]unitive damages may not be awarded in any civil action . . . other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff."[4]
This section further defines the terms "fraud" and "wantonness" as follows:
 "(1) FRAUD. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.
". . . .
 "(3) WANTONNESS. Conduct which is carried on with a reckless or conscious disregard of the rights or safety of others."
Ala. Code 1975, § 6-11-20(b). The Thompsons contend that during their case-in-chief they adduced clear and convincing evidence of both "fraud" and "wantonness" as those terms are defined in § 6-11-20(b).
Even viewing the evidence in a light most favorable to the Thompsons, this court cannot hold that they presented "clear and convincing evidence" that United consciously or deliberately engaged in fraud and wantonness with regard to the Thompsons. As we have already set forth in this opinion, the Thompsons failed to present sufficient evidence, even under the "substantial evidence" standard of § 12-21-12, that United consciously or deliberately acted with wantonness, i.e., that Rains's initial and ongoing statements regarding "full coverage" or United's purchase of force-placed insurance on the Thompsons' home were carried on with a reckless or conscious disregard for the Thompsons' safety or rights. Indeed, the record indicates that United sent several periodic notices to the Thompsons' post office box warning of the limitations of the force-placed Balboa insurance, in addition to the notice Ms. Thompson unquestionably did receive, but that Ms. Thompson did not receive these other notices because of her son's failure to deliver them to her or her husband.
Similarly, the Thompsons have not shown by clear and convincing evidence that Rains's representations that they were "fully covered" were "gross, oppressive, or malicious" or that they were made intentionally so as to deprive them of property or rights or to cause them injury. While we would not condone or hold blameless a practice of constantly assuring mortgagors that their insurance provides for full coverage, we cannot say under the facts of this case that the evidence presented meets the heightened standard adopted by our legislature for the award of exemplary damages. We therefore affirm the trial court's granting of United's directed verdict motion to the extent that it foreclosed consideration of punitive damages by the jury.
In summary, we affirm the judgment of the trial court as to the issues of punitive damages and as to the Thompsons' claims of wanton failure to procure insurance and negligent failure to repair. With respect to the Thompsons' claims of fraudulent misrepresentation and negligent failure to procure insurance, we reverse and remand. Because a new trial will be necessary in any event as to the remaining viable issues, and because it is unnecessary to our decision in this appeal, we express no opinion as to the admissibility at trial of any evidence of insurance premiums paid by United to Balboa. *Page 177 
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, MONROE, CRAWLEY, and THOMPSON, JJ., concur.
[1] United Companies Mortgage of Alabama was not named in the notice of appeal.
[2] We note that Rule 50, Ala.R.Civ.P., was recently amended so as to rename the "motion for directed verdict" as a "motion for judgment as a matter of law." The function of either motion is to test the legal sufficiency of an adversary's position, that is, whether an issue raised should properly be submitted to the jury.
[3] Balboa is not a party to this action.
[4] Section 6-11-20 specifically excepts from its scope wrongful death actions, which permit only the recovery of punitive damages. E.g., Black Belt Wood Co. v. Sessions, 514 So.2d 1249,1262-63 (Ala. 1986).